IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NEWSPAPER, NEWSPRINT, MAGAZINE AND FILM DELIVERY DRIVERS, HELPERS, AND HANDLERS, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 211,<br><br>Plaintiff,<br><br>v.<br><br>PG PUBLISHING CO., INC. d/b/a PITTSBURGH POST GAZETTE,<br><br>Defendant. | Civil Action No. 2:19-cv-1472<br><br>Judge J. Nicholas Ranjan |

## BRIEF IN SUPPORT OF DEFENDANT'S
## MOTION TO STAY PENDING APPEAL

Defendant Pittsburgh Post-Gazette ("Post-Gazette" or the "Company") moves pursuant to FED. R. CIV. P. 62(c) for a stay pending appeal of this Court's November 27, 2019 Order [ECF No. 20], granting the motion of plaintiff Newspaper, Newsprint, Magazine and Film Delivery Drivers, Helpers, and Handlers, International Brotherhood of Teamsters, Local Union No. 211 ("Union") for injunctive relief. The Post-Gazette requests the stay be retroactive to the Order's effective date.

### I.   INTRODUCTION

The Court's November 27, 2019 Order "enjoined and restrained [the Post-Gazette] from refusing to maintain the status quo under the CBA regarding healthcare coverage, manpower, shift scheduling, wages and layoffs pending the outcome of the contractual grievance process." [ECF No. 20]. Pursuant to 28 U.S.C. § 1292(a)(1), the Post-Gazette will file a notice of appeal of the Court's November 27, 2019 Order promptly after the Court's disposition of this motion to

stay.

A stay is appropriate primarily because the Post-Gazette is likely to prevail on an appeal from the Order granting injunctive relief. The reasons the Post-Gazette is likely to prevail are (i) because the injunction requested by the Union and granted by the Court regulates and interferes with the Post-Gazette's arguably protected rights under Section 8(d) of the National Labor Relations Act ("NLRA") to bargain to impasse and implement its bargaining proposals, it is preempted under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959); (ii) the injunction is not within the *Boys Markets* exception to the Norris-LaGuardia Act prohibition on federal court injunctions in labor disputes and is thus barred, (iii) the finding of an implied contract to support the Union's Section 301 claim long after contract expiration is an unwarranted extension of *Luden's Inc. v. Local Union No. 6 of the Bakery, Confectionary and Tobacco Workers' International Union of America*, 28 F.3d 347 (3d Cir. 1994), and (iv) the injunction is unclear as to its scope because it does not define or describe what constitutes the "status quo" and is unclear as to what it requires, given that the changes to manpower, shift scheduling, wages and layoffs referenced in the Union's motion for preliminary injunction were effected before the Union filed this suit.

## II. RELEVANT FACTS

The Post-Gazette and the Union were parties to a collective bargaining agreement ("Agreement") that commenced on November 7, 2014 and expired by its terms on March 31, 2017. [ECF No. 1, Ex. A; Ex. 1 (Lowe Decl.) at ¶ 9-10]. On January 9, 2017, more than two months before the Agreement expired, the Post-Gazette's Vice President and General Manager, Lisa Hurm ("Hurm"), sent the Union and its President, Joseph Molinero ("Molinero"), a letter stating, in part:

2

> This letter is to notify [the Union] of the desire of [the Post-Gazette] to negotiate a new contract and that the Company intends to terminate its collective bargaining agreement with [the Union] effective March 31, 2017. The current agreement expires on March 31, 2017. At that time, all contractual obligations of the current Agreement shall expire.
>
> The Company will continue to observe all established wages, hours and terms and conditions of employment as required by law, except those recognized by law as strictly contractual, after the Agreement expires. With respect to arbitration, the Company will decide its obligation to arbitrate grievances on a case-by-case basis.

[*Id.* at ¶ 11]. The parties began negotiating a successor agreement in March 2017. [*Id.* at ¶ 14]. No new agreement has been reached. [*Id.*].

On June 26, 2018, almost 15 months after the Agreement expired, the Post-Gazette's Senior HR Manager, Linda Guest ("Guest"), notified Molinero and the Union that the Company had decided to become a digital-only news organization and intended to phase out publication and distribution of its printed newspaper. [*Id.* at ¶ 7, 16]. Guest informed Molinero and the Union that, effective August 25, 2018, the Post-Gazette was eliminating two days of print operations. [*Id.* at ¶ 17]. Guest offered to engage in "effects bargaining" over that decision.[1] [*Id.* at ¶ 17]. The parties engaged in "effects bargaining," but did not reach an agreement. [*Id.* at ¶ 19]. Once the parties were at impasse on the effects bargaining proposals, the Post-Gazette implemented its final effects bargaining offer. [*Id.* at ¶ 20]. Approximately 13 employees represented by the Union were laid off in 2018 as a result of the Post-Gazette's decision to

---

[1] Under *First National Maintenance Corporation v. NLRB*, 452 U.S. 666 (1981), employer decisions which fundamentally alter the scope and nature of a company's business, like a partial closure or choice of product, are not subject to a duty to bargain with the union, although a duty exists to bargain over effects of such a decision. The Post-Gazette considered its decision to deliver its news products digitally and eliminate print operations as in this category.

eliminate two days of print. [*Id.* at ¶ 21]. New work schedules also were implemented. [*Id.*]. Employees chose their new work schedules by seniority. [*Id.*]. This process is referred to as a "bump." [*Id.*]. The Union did not challenge the layoffs. [*Id.*].

On July 17, 2019, Guest notified Molinero and the Union that the Post-Gazette was eliminating two additional days of print, effective September 30, 2019. [*Id.* at ¶ 22]. The elimination of two more print days continued the Post-Gazette's transition to a digital-only newspaper.[2] [*Id.* at ¶ 23]. Guest also informed Molinero and the Union that the Post-Gazette was eliminating distribution of its delivery partners' products (New York Times, USA Today, Wall Street Journal, and others) and closing its Sharpsburg Distribution Center. [*Id.* at ¶ 24]. Guest offered to engage in "effects bargaining" over the Company's decisions. [*Id.*].

As in 2018, the parties engaged in "effects bargaining" concerning the Post-Gazette's decision to eliminate two additional days of print and the delivery of alternative products. [*Id.* at ¶ 26]. On October 1, 2019, the Post-Gazette presented the Union with its "Best and Final Offer for Effects Bargaining," which provided:

> 1. The Company's transportation work schedules for alternative products delivery and no alternative products delivery is attached hereto. The revised schedules reduce the staff by eleven (11). The Company's work schedule for no alternative products delivery will be effective immediately after delivery of the alternative products is discontinued. The Company's work schedule for home delivery and single copy is also attached. The circulation schedule reduced the staff by twenty-two (22).
>
> 2. The Company is proposing to use the same layoff by seniority procedure the parties used for the previous print day reductions which includes the dovetailed seniority list and bumping rights. The Company will accept volunteers as it did for the previous print day reductions.

---

[2] This decision, in the Post-Gazette's view, also was not subject to a bargaining obligation. *See supra* n.1.

4

>   3. The Company is proposing the same severance formula for laid off employees used for the previous print day reductions. Laid off employees will receive one (1) week of severance pay for each year of service with a cap of six (6) weeks.
>
>   4. Employees who no longer work a full-time work schedule of 35 hours per week will no longer be eligible for health insurance. The Company will review eligibility for health insurance coverage on a monthly basis. For example, if an employee works full-time in September but works a part-time schedule of 21 or 28 hours a week in October due to the elimination of two additional print days, then that employee would lose coverage beginning in November.
>
>   5. The Company is proposing to pay substitutes only for their actual shifts worked. Because the print schedule will be reduced to three (3) days, it is highly unlikely a substitute can average five (5) shifts per week.

[*Id.* at ¶ 27]. The Union rejected the Post-Gazette's "Best and Final Offer for Effects Bargaining." [*Id.* at ¶ 29].

On October 14, 2019, the Post-Gazette informed the Union that the "Company believes the parties are at impasse" with respect to "effects bargaining" concerning the Post-Gazette's decision to eliminate two additional days of print and the delivery of its alternative products. [*Id.* at ¶ 30]. The Post-Gazette informed the Union that it was implementing its October 1, 2019 "Best and Final Offer for Effects Bargaining." [*Id.* at ¶ 31]. On October 14, 2019, the Post-Gazette notified Molinero and the Union of the new work schedules and the dates for the upcoming bumps in the transportation and circulation departments. [*Id.* at ¶ 33]. Employees were allowed to choose their work shifts by seniority when the new work schedules were implemented. [*Id.*].

Most of the bargaining unit employees currently are working three and/or four-day work schedules as a result of the elimination of print days on September 30, 2019. [*Id.* at ¶ 35]. The

Post-Gazette implemented these work schedules on October 14, 2019, after the Company reached impasse in "effects bargaining" with the Union. [*Id.*].

On October 22, 2019, Guest notified Molinero about the procedures the Company intended to use for the layoff of bargaining unit employees, which were consistent with what was in its "Best and Final Offer for Effects Bargaining." [*Id.* at ¶ 36]. Twenty-six Union-represented employees voluntarily accepted the layoff and corresponding severance benefits. [*Id.* at ¶ 38]. These employees separated from their Post-Gazette employment on November 10, 2019 and received severance pay. [*Id.*]. Based on the elimination of print and delivery days, the Post-Gazette has no work for these former employees to perform. [*Id.* at ¶ 40].

On November 4, 2019, Molinero and the Union filed a grievance complaining of violations of the long-expired Agreement - "the employer's unilateral institution of a bump[,]" failure to follow procedures in Article III, Section 3, the expected failure to pay amounts provided under Article IV, Section 2, and referencing Article I, Section 10, Subsection H, which said that during grievance processing, subject to certain exceptions, the business status quo shall be maintained. [ECF No. 1 at ¶ 35 and Ex. B at ¶ 25 and Ex. 6]. The grievance does not relate to layoffs or health insurance benefits. [ECF No. 1 at ¶ 35 and Ex. B at ¶ 25 and Ex. 6].

On December 1, 2019, the Post-Gazette intended to implement the final portion of its "Best and Final Offer for Effects Bargaining" – the elimination of health benefits for those employees who did not work an average of 35 hours in a work week in November.[3] [Ex. 1 (Lowe Decl) at ¶ 45].

---

[3]    In compliance with the Court's Order, the Post-Gazette has attempted to contact the Union's health fund to make payments to continue health benefits for all employees who would have been impacted by the December 1, 2019 elimination of health benefits.

6

On November 12, 2018, the Union filed this suit, asking the Court, based on reference to long-expired Article I, Section 10, Subsection H, in its November 4, 2019 grievance, to enjoin the Post-Gazette from any interruption of the business status quo while that grievance is pending. The complaint makes no mention of the Post-Gazette's efforts to effect necessary changes in connection with its transition to a digital newspaper in accordance with its rights and bargaining obligations under the NLRA. This suit is an end-run around the NLRA and National Labor Relations Board ("NLRB") procedures to try to stop unwanted changes at the Post-Gazette.

### III.   MOTION TO STAY PENDING APPEAL STANDARD

FED. R. CIV. P. 62(c) states that "[w]hile an appeal is pending from an interlocutory order ... that grants ... an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights[.]" Issuance of a stay pending appeal is "an exercise of judicial discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). "The inquiry in determining a motion to stay pending appeal is similar to that in determining a motion for grant of preliminary injunctive relief." *Harris v. Pernsley*, 654 F.Supp. 1057, 1059 (E.D. Pa. 1987). "In exercising its discretion, the court must balance the equities and determine whether the movant has shown that (1) he will likely prevail on the merits of the appeal, (2) he will suffer irreparable injury if the stay is denied, (3) other parties will not be substantially harmed by the stay, and (4) the public interest will be served by granting the stay." *Id.* While the four "factors structure the inquiry ... no one aspect will determine its outcome. Rather, proper judgment entails a delicate balancing of all elements." *Constructors Assoc. of Western Pa. v. Kreps*, 573 F.2d 811, 835 (3d Cir. 1978).

## IV. ARGUMENT

### A. The Post-Gazette is likely to prevail on the merits in an appeal of the November 27 2019 injunction.

A party petitioning a trial court for a stay pending appeal must demonstrate that it will "likely prevail on [the] merits" if the trial court is satisfied that there is a "reasonably possibility - albeit not a probability," that its decision was in error. *Harris*, 654 F.Supp. at 1060 (internal quotations omitted). The Post-Gazette meets that standard for the reasons below.

   1. The Court's November 27, 2019 injunction interferes with the Post-Gazette's rights under the NLRA by restricting or eliminating its right to bargain to impasse and implement proposed changes at impasse and is therefore subject to *Garmon* preemption.

Section 8(d) of the NLRA requires the parties to a collective bargaining relationship to bargain in good faith toward agreement. *See* 29 U.S.C. § 158(d). Unilateral changes by the employer in the course of collective bargaining on matters that are mandatory subjects of bargaining are, absent an impasse, generally held to be *per se* refusals to bargain. *NLRB v. Katz*, 369 U.S. 736 (1962). Thus, when a collective bargaining agreement expires and negotiations commence for a new collective bargaining agreement, an employer cannot unilaterally alter the previously-established terms and conditions of employment that are the subject of mandatory bargaining under Section 8(d) of the NLRA. This is referred to as the obligation to maintain the *status quo ante*. *See Richfield Hospitality, Inc.*, 368 NLRB No. 44, at *3 (Aug. 15, 2019) ("It is clear that, following the expiration of a collective bargaining agreement, an employer must maintain the status quo of all mandatory subjects of bargaining until the parties either agree on a new contract or reach a good-faith impasse in negotiations"). This is exactly what the Post-Gazette was referring to in its January 9, 2017 letter to the Union when it said it would "continue to observe all established wages, hours and terms and conditions of employment as required by

8

law." [Ex. A; Ex. 1 (Lowe Decl.) at ¶ 11]. This obligation includes the duty to continue to discuss and process grievances after a collective bargaining agreement has expired. *Hilton-Davis Chemical Co.*, 185 NLRB 241, 242-43 (1970) (during "the hiatus which sometimes exists - and existed here - between the expiration of one agreement and the reaching of a new one, it follows that employers and unions must continue to meet and confer and to seek agreement in good faith, not only over the terms and conditions of a proposed new agreement, but also over employee grievances which may arise during such hiatus"); *see also Libby Corp.*, 12 NLRB Advice Mem. Rep. 22098, 1985 WL 1149934 (1985) ("The Board has held that an employer has a continuing post-contract obligation to meet with a collective bargaining representative for the purpose of discussing employee grievances. This is consistent with the rule that an employer must continue to honor the extant terms and conditions of employment, even after a contract has expired, until impasse has been reached").

An employer may only impose unilateral changes in negotiations after an impasse in negotiations is reached. *See Richfield Hospitality*, 368 NLRB No. 44, at \*3; *Taft Broadcasting Co.*, 163 NLRB 475 (1967). A union's remedy where it believes an employer has implemented a bargaining proposal without reaching impasse is to raise a complaint with the NLRB. *See Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 321 (3d Cir. 2004) (if a cause of action "implicated ... conduct that would be prohibited as an unfair labor practice under Section 8 of the NLRA, the cause of action is preempted"). This is preemption under *Garmon*.

Here, the Post-Gazette and the Union engaged in "effects bargaining" in late summer 2019 concerning the Post-Gazette's decision to eliminate two additional days of print and delivery of alternative products in furtherance of its decision to become a digital newspaper. [Ex. 1 (Lowe Decl.) at ¶ 30-31]. After informing the Union that it believed the parties had

9

reached impasse, the Post-Gazette implemented its bargaining proposals. [*Id.* at ¶ 31]. These were actions taken by the Post-Gazette in accordance with its duty to bargain under Section 8(d) of the NLRA.

By seeking and obtaining an injunction purportedly to maintain the status quo preceding its November 4, 2019 grievance, the Union has persuaded the Court to issue an injunction that directly interferes with and may preclude the Post-Gazette from implementing changes on which it believes it has bargained to impasse in accordance with its obligation under Section 8(d) of the NLRA. To the extent the injunction addresses already-effected layoffs, schedule changes and shift changes, as well as health changes that were to be effected on December 1, 2019, that is unquestionably true.

That the Union pursued this injunction based on a contractual theory does not exempt the Union's claim or the injunction from *Garmon* preemption. The test for *Garmon* preemption is not the etiology of the claim, but whether the subject matter of the claim invades NLRB unfair labor practice jurisdiction. The test for *Garmon* preemption is whether an activity is "arguably" subject to Section 7 or Section 8 of the NLRA. 359 U.S. at 245. What the Union sought to enjoin and what the injunction here purports to address unquestionably meets that test.

On this ground also, the Post-Gazette submits that it has both a reasonable and substantial probability of succeeding on an appeal of the issuance of the injunction in this case.

> 2. Because it is not within the *Boys Markets* exception, the Court's November 27, 2019 injunction is prohibited by the anti-injunction provisions of the Norris-LaGuardia Act.

The Norris-LaGuardia Act broadly prohibits federal courts from issuing injunctions in labor disputes. *See* 29 U.S.C. § 101 (1988) ("No court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case

10

involving or growing out of a labor dispute"). When Congress enacted Section 301 of the Labor Management Relations Act, authorizing civil actions in federal courts for breach of collective bargaining agreements, it did not expressly amend the anti-injunction provisions of the Norris-LaGuardia Act. The Supreme Court addressed the tension between these two statutes three times in the 1970s.

In *Boys Markets, Incorporated v. Retail Clerks Union, Local 770*, 428 U.S. 397 (1976), the Supreme Court accommodated Section 301 and the seemingly absolute anti-injunction strictures of the Norris-LaGuardia Act by invoking the policy developed under Section 301 favoring arbitration as a mechanism for settling labor disputes. *See United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers of Am. v. Warrior & Gulf Navig. Co.*, 363 U.S. 574 (1960); *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (1960). The Court recognized a limited employer right to injunctive relief, conditioned on the existence of a "strike . . . over a grievance which both parties are contractually bound to arbitrate." 398 U.S. at 254. *Boys Markets* did not establish a general specific performance remedy, but only relaxed the strictures of the Norris-LaGuardia Act for a limited class of breach-of-contract strikes. In *Gateway Coal Company v. United Mine Workers*, 414 U.S. 368 (1974), the Supreme Court again found a *Boys Markets* exception to the anti-injunction rule, upholding an order enjoining a strike alleged to be in breach of contract and ruling that any dispute over the scope of the no-strike obligation should be resolved in arbitration. Justice Powell's *Gateway Coal* opinion reiterated the Court's high regard for the policy favoring labor arbitration. In *Buffalo Forge Company v. United Steelworkers*, 428 U.S. 397 (1976), the Supreme Court restricted *Gateway Coal's* authorization of a strike injunction pending arbitration resolution of the scope of the no-strike obligation. Reverting to the principal rationale of the *Boys Markets*

11

accommodation for Section 301 and the Norris-LaGuardia Act – furtherance of arbitration as a means of settling labor disputes – the Court determined that more than a dispute about the application of a no-strike obligation is required to justify injunctive relief.

The exception to the Norris-LaGuardia Act prohibition on labor injunctions, developed in these cases, is highly restricted – it is available where a strike is occurring in derogation of the policy favoring labor arbitration, and even then in only limited circumstances. No exception to the Norris-LaGuardia Act exists allowing injunctions requiring specific performance of collective bargaining agreement provisions. *See Heheman v. E.W. Scrippts Co.*, 661 F.2d 1115, 1123-25 (6th Cir. 1981) (Norris-LaGuardia Act does not permit the issuance of an injunction for specific performance of "lifetime employment" provision of a collective bargaining agreement); *Columbia River Chapter, Pac. Log Scalers Ass'n v. Columbia River Log Scaling & Grading Bureau*, No. 74-906, 1975 WL 1030, at *1 (D. Or. Feb. 7, 1975) (Norris-LaGuardia Act does not permit the issuance of an injunction "ordering reinstatement of [a] discharged employee").

Although the Supreme Court has never considered a case where a labor union sought to enjoin management's action pending arbitration, lower courts have agreed that the *Boys Markets* exception applies to litigation brought by unions and that unions seeking injunctive relief must satisfy the same standards that the Court established for management – promoting the labor arbitration process. The Third Circuit has adopted the so-called "hollow formality" standard, which focuses on the overall policy and rule of *Boys Markets* and its progeny – namely, to preserve the integrity of the arbitration process. This standard allows a court to grant an injunction if failure to do so would render the arbitral process a "hollow formality" because the arbitral award could not return the parties to the prior status quo. *See Nursing Home & Hosp. Union No. 434 v. Sky Vue Terrace, Inc.*, 759 F. 2d 1094 (3d Cir. 1985).

12

Neither the request for injunction nor the injunction issued in this case is within this exception. The Union did not request an injunction to protect the arbitration process. The complaint includes no reference to any request for arbitration of the Union's November 4 grievance. [*See* ECF No. 1 at ¶ 35 and Ex. B at ¶ 25 and Ex. 6]. What the Union did request was an injunction to enforce a long-expired contract provision that required, when the Agreement was extant, maintenance of the status quo preceding a filed grievance. That is exactly what the *Boys Markets* exception to Norris-LaGuardia does not permit – an injunction to obtain specific performance of a contract provision, here a long-expired provision. The Court's Order requires the Post-Gazette to maintain the status quo, but says nothing about arbitration. [*See* ECF No. 20].

The Post-Gazette is aware of no cases applying the *Boys Market* exception to facts or a situation like these. There are no cases requiring an employer to maintain the status quo, absent a request for arbitration. Additionally, there are no cases finding the *Boys Market* exception to support issuance of an injunction to maintain the status quo based on a contract provision that expired along with the underlying agreement two and one-half years earlier. The relief sought (and granted) in this case falls outside of the *Boys Market* exception and is proscribed by the Norris-LaGuardia Act.

The Post-Gazette respectfully submits that it has a reasonable and it believes substantial probability of succeeding on an appeal of the issuance of the injunction in this case, based on this ground.

> 3. The conclusion that an enforceable "implied-in-fact" agreement exists between the Union and the Post-Gazette, based on the expired Agreement, is erroneous.

The Court relies heavily on *Luden's* to support its conclusion that an "implied-in-fact agreement" exists between the Post-Gazette and the Union that can be enforced under Section

13

301. [*See* ECF No. 19]. The Court's conclusion is erroneous.

First, the Court's Opinion is based almost entirely on the complaint without fact finding.

Second, the Court's Opinion emphasizes that an implied-in-fact agreement arose because the Post-Gazette (1) stated that it would decide its obligation to arbitrate grievances on "case-by-case basis," and (2) has complied with the dues check off/union security clause in the expired Agreement. [*See id.* at p. 9]. However, these actions were required of the Post-Gazette by its obligation under Section 8(d) of the NLRA to maintain the *status quo ante* after expiration of the Agreement on March 30, 2017. *See Lincoln Lutheran of Racine*, 362 NLRB 1655 (2015) (an employer is obligated to continue dues checkoff after the expiration of a collective bargaining agreement establishing that arrangement); *Ind. & Mich. Elec. Co.*, 284 NLRB 53, 58-59 (1987) (an employer may not disavow arbitration on an across-the-board basis after a collective bargaining agreement expires, but must process grievances and determine whether grievances should be arbitrated based on the individual facts presented in the grievances); *Hilton-Davis*, 185 NLRB at 242 (an employer must process grievances after the expiration of a collective bargaining agreement, but need not arbitrate the grievances unless they arose under the expired agreement). Compliance with federal labor law requirements cannot establish the existence of an implied contract. If it does, then every employer obeying the NLRA's requirement to maintain the *status quo ante* post-contract expiration risks creating an implied agreement.

Third, the *Luden's* decision does not reach as far as this Court has extended it. The Third Circuit in *Luden's* said that "the term of the implied-in-fact CBA we recognize here is restricted to an arbitration provision" and that "it may well be that the implied-in-fact CBA does not incorporate all, or any other, of the terms of the lapsed CBA." 28 F.3d at 361. The court then stated that it was silence that gave rise to the presumption of a continued arbitration provision.

14

*Id.* at 362. Here, the Post-Gazette was not silent. It specifically stated both that it considered the Agreement's terms to have expired on March 31, 2017 and that it would decide the arbitrability of post-expiration grievances case-by-case (the latter statement consistent with the requirements of the NLRB decision in *Indiana & Michigan Electric Company*). [*See* Ex. A; Ex. 1 (Lowe Decl.) at ¶ 11]. The *Luden's* court further said that the "[NLRB's] primary jurisdiction over unfair labor practices also counsels against the inclusion in an implied-in-fact CBA of a term or condition [in] the group of items subject to mandatory bargaining . . . ." *Id.* at 362. The terms and conditions which the Union has here grieved or on which it sought an injunction – bumping, wage loss provision, layoffs, scheduling and health insurance – are all mandatory subjects of bargaining. So, even under *Luden's*, they cannot be part of an implied contract. A contract provision requiring maintenance of the status quo when a grievance is filed would necessarily also be mandatory.

Absent this unwarranted extension of *Luden's*, no basis exists to find an arbitrable grievance or to apply Section 301, which is further ground for the possibility and probability of success on appeal.

    4.    **The Court's injunction should be stayed because its scope is unclear.**

The Court's Order "enjoined and restrained [the Post-Gazette] from refusing to maintain the status quo under the CBA regarding healthcare coverage, manpower, shift scheduling, wages and layoffs pending the outcome of the contractual grievance process." [ECF No. 20].

It is not clear what the "status quo" is. *See Pittsburgh-Des Moines Steel Co. v. United Steelworkers of Am.*, 633 F.2d 302, 309 (3d Cir. 1980) (reversing preliminary injunction that failed to set forth precisely what conduct it was enjoining). Layoffs have already occurred. Twenty-six employees voluntarily accepted layoff with corresponding severance benefits. [Ex. 1

15

(Lowe Decl.) at ¶ 38]. These employees have separated from their Post-Gazette employment and received severance pay. [*Id.*]. The Post-Gazette has currently no work for these former employees to perform. [*Id.* at ¶ 40].

The scheduling and shift changes have also been implemented. The Post-Gazette implemented the shift changes on October 15, 2019. [*Id.* at ¶ 33]. The majority of the employees represented by the Union are currently working three and/or four day work schedules as a result of elimination of print days on September 30, 2019. [*Id.* at ¶ 35].

It is unclear whether the injunction is aimed at the health care changes that would have resulted on December 1, 2019 from the previously-reduced work hours and other future events, or is more drastically directed to retroactively modifying changes already effected. A separate ground for stay is that the Court's Order does not set forth with specificity what conduct it is enjoining.

B. The Post-Gazette will suffer irreparable injury if a stay is denied because it has already implemented at least some of the terms and conditions of employment that may be subject to the Court's injunction.

Subject to clarification of the injunction order, if the Court's denies the Post-Gazette's request for a stay, the Company will (or may) be forced to undo layoffs and change schedules that have already taken place, in derogation of its rights under the NLRA. Specifically, 26 employees voluntarily accepted layoff and separated from employment with the Post-Gazette on November 10, 2019. [Ex. 1 (Lowe Decl.) at ¶ 38]. There currently is no work for these former employees to perform. [*Id.* at ¶ 40]. On September 30, 2019, the Post-Gazette eliminated two days of print. As a result of the reduction, the Post-Gazette has already implemented new schedules for its employees and the majority of the employees represented by the Union are working three or four-day shifts. [*Id.* at ¶ 33, 35]. If the Post-Gazette is forced to re-hire laid-off

16

employees and/or change its scheduling to increase employees' hours, the employees will have no work to perform.

C. The Union will not be substantially harmed by the stay because its members can be made whole through monetary damages.

"In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). The Third Circuit has stated that "we have never upheld an injunction where the claimed injury constituted a loss of money or loss of capable recoupment in a proper action at law." *Id.* (internal quotations omitted). Further, the court stated that "the availability of adequate monetary damages belies a claim of irreparable injury." *Id.* (internal quotations omitted). The Court's Order requires the Post-Gazette to maintain the status quo concerning layoffs, wages, healthcare coverage, scheduling, and staffing. [*See* ECF No. 20]. Each term and condition of employment addressed by the Court's Order can be addressed through monetary damages in the event the Union succeeds on the merits of its claim. Specifically, laid-off individuals and employees working a reduced schedule can be made whole through back wages.[4] Therefore, the issuance of the stay is appropriate because the Union and its members will not be substantially harmed by its issuance.

D. The public interest is best served by allowing the Third Circuit to address this matter before requiring the Post-Gazette to undo the implementation of its bargaining proposals.

As set forth above, if the Court grants the stay, the Union and its members may be made whole through monetary damages. In contrast, if the Court denies the stay, the Post-Gazette may be required to re-hire laid-off employees and/or change revised schedules, adopted pursuant to its

---

[4] The Post-Gazette has taken steps to continue health insurance coverage for the impacted employees starting December 1, 2019 and going forward.

17

transition to a digital newspaper, to increase employees' hours. However, these employees will have no work to perform. Therefore, the public interest is best served by issuing a stay and allowing the Third Circuit to address the Post-Gazette's appeal of an injunction, the validity of which is on several grounds subject to question.

## V. CONCLUSION

The Post-Gazette respectfully requests the Court stay its November 27, 2019 Order [ECF No. 20] pending appeal, retroactive to the date the Order was issued or its effective date.

Respectfully submitted,

By: */s/ Brian M. Hentosz*
Terrence H. Murphy, PA ID No. 36356
tmurphy@littler.com

Brian M. Hentosz, PA ID No. 317176
bhentosz@littler.com

LITTLER MENDELSON, P.C.
625 Liberty Avenue, 26th Floor
Pittsburgh, PA 15222
Ph: 412.201.7621/7676
Fax: 412.291.3373

Attorneys for Defendant

Dated: December 2, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of December 2019 a true and correct copy of the foregoing Brief in Support of Defendant's Motion to Stay Pending Appeal was served and filed using the Western District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon the following counsel of record:

> Joseph J. Pass
> jjp@jpilaw.com
> 219 Fort Pitt Boulevard
> Pittsburgh, PA 15222
>
> Patrick K. Lemon
> pkl@jpilaw.com
> 219 Fort Pitt Boulevard
> Pittsburgh, PA 15222

By: */s/ Brian M. Hentosz*