IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

NEWSPAPER, NEWSPRINT, MAGAZINE )
AND FILM DELIVERY DRIVERS, HELPERS, )
AND HANDLERS, INTERNATIONAL )
BROTHERHOOD OF TEAMSTERS, )
LOCAL UNION NO. 211, )
)
)
Plaintiff, )
)                    Civil Action No. 2:19-cv-01472-NR
)
)                    Judge J. Nicholas Ranjan
vs. )
)                    ***ELECTRONICALLY FILED***
)
PG PUBLISHING CO., INC. d/b/a/ )
PITTSBURGH POST GAZETTE, )
)
Defendant. )
)

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO STAY PENDING APPEAL

Plaintiff, Newspaper, Newsprint, Magazine, and Film Delivery Drivers, Helpers, and Handlers, International Brotherhood of Teamsters, Local Union No. 211, (hereinafter "Union" or "Local 211") submits the following Memorandum in Opposition to Defendant's Motion to Stay Pending Appeal.

## I.    INTRODUCTION

On November 27, 2019, the Court entered a Memorandum Opinion [ECF No. 19] and Order of Court [ECF No. 20] granting the Union's Motion for Preliminary Injunction [ECF No. 2] and denying Defendant's Motion to Dismiss [ECF No. 14]. The Court's order enjoined Defendant from refusing to preserve the status quo of the parties' contractual relationship while the underlying dispute moves through the contractual grievance resolution procedure. [ECF No. 20]

Defendant filed a Motion to Stay Pending Appeal [ECF No. 22] and Brief in Support [ECF No. 23] on December 2, 2019.

The Union respectfully urges the Court to deny Defendant's Motion for Stay Pending Appeal. Defendant raises a host of alleged new issues, both legal and factual, that it never addressed in any of its prior submissions to this Court. Essentially requesting that the Court again decide an issue it has already decided based on allegedly new facts and arguments that clearly arose before Defendant's prior submission is inappropriate. Nevertheless, in the unlikely event the Court decides to delve into the untimely issues raised by Defendant, those issues remain unpersuasive. Without rehashing and reiterating arguments the Union has already made in prior submissions to the Court, which the Union incorporates herein, the following will focus on those issues belatedly and improperly raised by the Defendant in its current motion.

Defendant is unlikely to prevail on appeal for four principle reasons. First, *Garmon* preemption is inapplicable to this case because the Union seeks to enforce an implied-in-fact contract, not its separate rights under the National Labor Relations Act. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 263 (1959). Second, the injunction is not prohibited by the Norris-LaGuardia Act because the instant case fits squarely within the *Boys Market* exception. 398 U.S. 235 (1970). Third, the Court properly relied upon and applied binding Third Circuit precedent. *Luden's Inc. v. Local Union No. 6*, 28 F. 3d 347 (1994). Fourth, contrary to Defendant's assertions, the scope of the injunction is quite clear.

In addition, the Post-Gazette will not suffer irreparable injury if the court denies its motion as it will only be required to do what it has already done for decades. The Union will be substantially harmed if the Court grants the motion principally because dozens of workers will lose their livelihoods or be stripped of their health insurance coverage or both. Public interest

clearly favors denying the motion for stay given the clear federal policy favoring peaceful resolution of industrial disputes by arbitration. Finally, granting a stay of a preliminary injunction pending appeal is logically inconsistent with the Court's well-reasoned conclusion that the Union and its members would suffer irreparable harm in the absence of an injunction.

## II.   ARGUMENT

### A.   *Defendant's facts and arguments raised for the first time in its motion for a stay are untimely and should not be considered.*

Defendant seemingly takes issue with the Court basing its opinion on the allegations of the Union's complaint and the Union's supporting affidavits. [ECF No. 23 at p 14]. This argument has serious, abundant, and obvious flaws. As the Court noted in its opinion, Defendant agreed that the decision would be made on the written filings. In addition, Defendant had ample opportunity to respond to the Union's arguments and allegations and provide relevant competing facts. Save one letter from January 2017, it did not. To boil that argument down, Defendant thinks its motion should be granted because the Judge did not consider facts that Defendant never offered. It is literally impossible to consider facts someone does not know. The holes in Defendant's argument abound even more. In response to the Union's motion for preliminary injunction, Defendant filed a motion to dismiss. Civil procedure 101 teaches that when filing a motion to dismiss, Defendant accepts all of Plaintiff's well plead allegations as true and courts construe all facts in a light most favorable to the Plaintiff. *Fowler v. UPMC Shadyside*, 578 F. 3d. 203, 210-211 (3d. Cir. 2009). Under the standard of review, which Defendant urged this Court to consider, the Court was bound to accept Plaintiff's allegations as true. Even if it had not, Defendant offered almost no competing evidence so there was nothing else for the Court to consider.

Now, somewhat bafflingly, Defendant seeks to introduce new evidence it had every opportunity to introduce already after the fact. These facts should not be considered by the Court

and should be dismissed as untimely. In its Motion for a Stay, Defendant failed to recognize that the Court had already "…encouraged the Post-Gazette to file an omnibus opposition to the Union's motion in which it would raise any legal arguments about the court's exercise of jurisdiction and present factual evidence to rebut the Union's affidavit and documentary submission." [ECF No. 19]. Instead, Defendant elected to file a Motion to Dismiss pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure. [ECF Nos. 14]. In deciding that motion, the Court applied the rule that a court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. *Fowler v. UPMC Shadyside*, 578 F. 3d. 203, 210-211 (3d. Cir. 2009). Defendant now attempts to raise a host of alleged new issues that it never addressed in any of its submissions to this Court. Requesting that the Court again decide an issue it has already decided based on purportedly new alleged facts and arguments that clearly arose and Defendant knew about before Defendant's prior submission is wholly inappropriate at this late juncture. In essence, Defendant requests a "do-over." Plaintiffs respectfully urge the Court to disregard any of the newfound, litigation prompted afterthought submissions. Defendant did not submit this evidence at the time of its Motion to Dismiss, but instead waited until the Court had rendered its decision based on the record before it, a record that included only one document in support of Defendant's position. As a result, Defendant's motion for stay relying on untimely arguments and evidence should be denied.

*B.*      *Defendant failed to satisfy the elements required for a motion to stay.*

Under F.R.C.P. 62(c), an injunction will not be stayed pending appeal "unless the court orders otherwise." In turn, under F.R.C.P. 62 (d), "while an appeal is pending from an interlocutory order or final judgment that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Courts

4

consider four factors when deciding a motion to stay a preliminary injunction pending appeal: (1) movant's likelihood of success on the merits; (2) whether movant will suffer irreparable harm absent stay; (3) whether the opposing party will suffer irreparable harm if the court issues a stay; and (4) whether public interest favors granting the stay. *FTC v. Equitable Res., Inc.*, 2007 U.S. Dist. Lexis 36890 (W.D. Pa. 2007), citing *Hilton v. Braunskill*, 481 U.S. 770 (1987). These "familiar" four factors are essentially the same four factors the court considered in granting the preliminary injunction in the first instance. *Id*. For the same reasons that the Court granted the Union's preliminary injunction, Defendant fails to satisfy each of the requisite elements for a stay and the Court should deny Defendant's motion.

    *1.*      *Defendant is unlikely to prevail on the merits of its appeal.*

        *i.*      *Garmon does not preempt this action.*

In arguing preemption, Defendant again attempts to muddy the waters of this dispute by confusing the enforcement of rights under the National Labor Relations Act with what the instant action sought and the court ordered—enforcement of an implied-in-fact contract under the Labor Management Relations Act. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 263 (1959). The Supreme Court ruled that federal courts may exercise jurisdiction over suits to enforce collective bargaining agreements even when the contested conduct is arguably cognizable under the NLRA because Congress deliberately sought to leave enforcement of collective bargaining agreements to the "usual process of law". *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 298 (1971); See also *Mack Trucks Inc. v. International Union, United Autoworkers, etc.*, 856 F. 2d 579, 585 (3d. Cir. 1988). As such, these two distinct rights can give rise to separate actions that necessarily arise in different fora. *Luden's Inc. v. Local Union No. 6*, 28 F. 3d 347 (3d. Cir. 1994); *Nolde Brothers v. Bakery Workers*, 430 U.S. 243 (1977);

*Litton Printing v. NLRB,* 501 U.S. 190 at 202-203 (1991). An unfair labor practice charge would be filed with and adjudicated in the first instance by the National Labor Relations Board. Simply, that is not what the Union sought here. Rather, the Union in this case sought to enforce a contract to preserve the status quo of the parties' relationship while the Union's grievance moves through the contractual grievance machinery. The Union could not seek such an injunction before the National Labor Relations Board. Instead, the Federal District Court of the Western District of Pennsylvania is the appropriate government body to exercise jurisdiction over just this manner of dispute. Because this case is entirely separate and apart from the rights and obligations of the parties under the NLRA, *Garmon* preemption is inapplicable and Defendant is unlikely to succeed on the merits of its appeal.

Defendant's discussion of the bargaining history between the parties is likewise unavailing. Despite Defendant's assertions to the contrary, the parties have not reached an impasse in negotiations. (Pass Affidavit attached hereto at ¶¶ 3, 7 *passim*).[1] Instead a number of relevant contractual provisions and proposals have not even been discussed by the parties. (Pass Affidavit at ¶¶8, 9). Implementing an initial proposal after going through hollow motions masquerading as bargaining does not amount to an impasse permitting the PG to implement its proposed changes. Offering no compromise whatsoever and then implementing an initial proposal cannot reasonably be considered good faith bargaining. Defendant's "belief" (as it terms it) or stubborn baseless insistence (what it really is) that an impasse exists does not make it so. If Defendant actually thinks that the Union has engaged in an unfair labor practice, it is free to file a charge with the NLRB. It has not.

---

[1] The Union steadfastly maintains that the Court need not consider any new evidence in order to dispose of Defendant's motion and rule in the Union's favor. Nevertheless, in the event the Court does consider Defendant's untimely evidence, the Union would be remiss if it did not respond to some Defendant's baseless allegations.

ii.     *The Norris-LaGuardia Act does not prohibit injunction in this case.*

The Union must concede that the Norris-LaGuardia Act generally disfavors injunctive relief in labor disputes. However, that is not an absolute prohibition—far from it. Injunctive relief remains appropriate where necessary to further fundamental federal labor policy promoting the voluntary resolution of labor disputes through grievance and arbitration procedures. *Boys Market, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970). Indeed, "The Boys Market exception to the Norris-LaGuardia Act permits federal courts to enjoin conduct stemming from a labor dispute when that conduct 'frustrate(s) the arbitral processes.'" *United Steelworkers of Am. v. Ft. Pitt Steel Casting*, 598 F.2d 1273, 1282 (3d Cir. 1979) (quoting *Buffalo Forge Co. v. United Steelworkers of Am.*, 428 U.S. 397 (1976)). The Third Circuit has held: "[T]he arbitral processes are frustrated when the arbitrator's award is no more than 'a hollow formality' because 'when rendered (it) could not return the parties substantially to the status quo ante.'" *Id.* (quoting *Lever Bros. v. International Chemical Workers, Local 217*, 554 F.2d 115, 123 (4th Cir. 1976)).

The preliminary injunction in this case fits neatly within the *Boys Market* exception. Defendant refused to maintain the status quo while the Union's grievance was pending. Defendant unilaterally laid off dozens of workers, denied others guaranteed pay, and changed employee schedules. Perhaps most alarmingly, Defendant announced its intention to strip dozens of remaining workers of their healthcare insurance coverage. This is exactly the type of employer conduct that, if left unchecked, would frustrate the arbitral process and render it a hollow formality. Defendant's actions would force Union members to make decisions such as foregoing necessary medical care. That is the type of decision that cannot be undone. In these circumstances, the *Boys Market* exception applies and the Court's decision in this case did not conflict with the Norris-LaGuardia Act.

In its brief, Defendant argues that *Boys Market* and its progeny only apply to "a limited class of breach-of-contract strikes" and that a preliminary injunction in the labor context cannot order specific performance. [ECF No. 23 at pp. 10-13]. Again, Defendant's interpretation and reliance on these cases for that proposition is misplaced. Although it arose in the context of enjoining objectionable Union activity, the rationale of the *Boys Market* exception applies equally when a union seeks to enjoin objectionable employer conduct. *Nursing Home & Hospital Union No. 434 v. Sky Vue Terrace, Inc.*, 759 F.2d 1094, 1098 (3d. Cir. 1985). In addition, enjoining a Union from striking when a CBA contains a no strike provision exemplifies an order directing specific performance. It directs the Union to follow its contractual obligation not to engage in a work stoppage or strike. As such, Defendant's argument rings hollow and the *Boys Market* exception applies.

Defendant also cites and references a number of decisions that establish the strong federal policy in favor of arbitration specifically in the context of an injunction to preserve the status quo pending arbitration. [ECF No. 23 at pp. 10-13]. Yet, in a bit of mental gymnastics, Defendant then turns those decisions on their head and argues that they support Defendant's refusal to maintain the status quo and arbitrate the parties' workplace dispute. Indeed, federal courts highly favor arbitration as a means to promote industrial harmony and expedient resolution of workplace disputes. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 547, 577-578 (1960). In accord with this federal policy, the Union's preliminary injunction sought just that—a preservation of the status quo to maintain the integrity of the arbitration process. Due to the federal policy favoring arbitration, Defendant's motion should be denied.

Despite Defendant's assertions to the contrary, the Union has requested arbitration throughout this litigation. [ECF No. 1 at ¶¶14, 15, 16, 30-33, 35-37; ECF No. 3 at pp. 2, 5-7, 9,

13; ECF No. 11 at pp. 4, 5, 12; ECF No. 17 at p. 3]. Moreover, absent mutual agreement or withdrawal, that is the contractual end of any grievance. [CBA Section I (10) at pp. 8-10]. In this case, the Union filed a grievance that has not been settled or withdrawn. It simply has not progressed to the arbitration step of the grievance process yet. For this same reason, Defendant's claim that the court did not mention arbitration is without foundation. [ECF No. 23 at p. 13]. Even though the court's order did not use the word "arbitration", the court ordered Defendant to maintain the status quo "pending the outcome of the contractual grievance process until a final decision on the matter or matters at issue is reached." [ECF No. 20]. Several steps of the contractual grievance procedure precede arbitration. If the parties cannot reach an amicable settlement of the grievance at those initial steps, then either party can process the dispute to arbitration. There is nothing, aside from arbitration, that the court could have been referring to because under the parties' CBA, the grievance process culminates in final and binding arbitration. In the meantime, the status quo of the parties' relationship must be preserved.

### iii.   *The Court properly applied Luden's.*

Defendant's attempts to distinguish this case from *Luden's* are futile. The *Luden's* decision is plainly applicable to this matter. The federal policy favoring arbitration of workplace disputes as promoting industrial harmony is well established. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 547, 577-578 (1960).  In furtherance of that goal, the Third Circuit held that the existence of collective bargaining agreements advances the federal policy favoring peaceful labor relations and courts "generally apply contract law liberally in order to recognize a CBA which lessens strife and fosters congenial relations between employees and management." *Luden's Inc. v. Local Union No. 6*, 28 F. 3d 347, 359 (1994). As such, under traditional principles of contractual interpretation, the terms of an expired CBA may continue in full force by operation

9

of an implied-in-fact contract. *Id.* More specifically, when parties to a CBA continue to honor the terms of an expired agreement and neither party announced a particularized disavowal or repudiation of arbitration, the terms of the CBA survive expiration. That is what happened here. Defendant continued operating and Union members continued working under the same terms and conditions of employment set forth in the expired CBA. Union members never engaged in a work stoppage or strike of any kind. Defendant never specifically repudiated or disavowed the arbitration provision of the CBA, which includes a preservation of the status quo pending final resolution of a grievance. Under these circumstances, the *Luden's* decision controls and an implied-in-fact contract exists between the Union and Defendant.

### iv.    *The scope of the injunction is clear.*

Defendant's motion should be denied because the scope of the Court's injunction is quite clear. The Court ordered Defendant to maintain the status quo of the parties' relationship while the grievance dispute remains pending. This is not a puzzling or vague concept. That means returning to the state of affairs between the Union and Defendant before Defendant's actions that gave rise to the underlying grievance. Most notably, that entails continuing to provide healthcare for all employees and reinstating any employees who the Company hastily laid off. Preservation of the status quo also requires Defendant to undo the schedule and shift changes it implemented and the Union addressed in its grievance. Simply put, the order granting the preliminary injunction requires Defendant to continue operating exactly how it has been until its most recent unilateral changes.

It is worth noting that the Union could not preemptively file a grievance. Instead, it had to wait until the company violated the contract or announced its clear intention to do so. Otherwise, the grievance would be premature. Unquestionably, the Union filed its grievance in a timely manner and well within the contractual time limits to file a grievance—mere days after the

scheduling changes went into effect and after Defendant had declared it would lay off dozens of workers and cease providing healthcare coverage for many more. Defendant has not once asserted the Union's grievance was out of time under the terms of the CBA. There was no grievance to file until the company had committed a contractual violation or unmistakably declared its intention to do so.

    2.    *The Post-Gazette will not suffer irreparable injury if the court denies its motion.*

    Defendant would not suffer irreparable harm in the absence of a stay because all the preliminary injunction requires Defendant to do is exactly what it has done prior to its unilateral changes. Defendant claims it would be irreparably harmed because the individuals it laid off, improperly in the Union's view, would have no work to perform if reinstated. Frankly, that is a problem of Defendant's own creation and is irrelevant to this dispute. A party opposing injunctive relief cannot avoid its contractual obligations and alter the status quo by relying upon self-inflicted "irreparable" harm. *International Association of Machinists v. US Airways, Inc.*, 2003 U.S. Dist. Lexis 201514 (W.D. Pa. 2003), citing and discussing *Opticians Ass'n v. Independent Opticians*, 920 F. 2d. 187, 197 (3d. Cir. 1990), *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm Co.*, 290 F. 3d 578, 596 (3d. Cir. 2002), *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F. 3d. 800, 806 (3d. Cir. 1988). If Defendant had abided by its contractual obligation to maintain the status quo until settlement or decision of the issue in dispute, it would not have the problem it now proposes to have. Instead, Defendant decided to go forward with its changes in derogation of the CBA. Facing obviously foreseeable and self-inflicted, even if unwanted, contractual consequences of its actions does not provide any reasonable basis for irreparable harm. Moreover, the Post-Gazette reduced newspaper delivery to three days a week at the end of September 2019. Every union member ultimately laid off in November 2019 continued performing

all of their job responsibilities at least through the end of October 2019. (Pass Affidavit at ¶10). As such, this directly and unimpeachably contradicts Defendant's assertion that reinstated employees would have no work to do. In addition, there is no factual evidence of record that reinstated employees would be without work to perform. To the contrary, much work is being left undone since the improper layoffs.

Furthermore, Defendant's claims that the layoffs were "voluntary" is a mischaracterization. Not a single Union member would have left if not for Defendant's announced layoffs. It offered a choice for some employees with more seniority to accept a layoff and leave employment if they so desired. However, for the overwhelming majority of those laid off—those closer to the bottom of the seniority list—the "voluntary" choice was to accept being laid off or get laid off anyways. That is not a choice fairly characterized as voluntary. Providing healthcare coverage and employing people under the same terms and conditions of employment as it has for years does not provide a basis for irreparable harm to Defendant.

>    3.    *The Union will be substantially harmed if the Court grants the motion.*

For the first time, Defendant argues that the Union and its members would not be substantially harmed in the absence of the injunction. Setting aside the untimeliness of this argument, an issue the Union addressed above, it is also inaccurate. The Union and its members will suffer a serious, substantial, and irreparable harm if a stay were issued. Most pressing, Plaintiff's members, both those still currently employed and those improperly laid off, will be forced to choose whether to forgo necessary medical treatment and/or prescription drugs or pay steep out-of-pocket healthcare costs. Choosing whether or not to undergo necessary medical treatment while staring down a potentially life threatening illness is a decision that cannot be reversed. One's health and well-being cannot be restored after the fact by monetary damages.

Thirty union members have also entirely lost their livelihood as well as their healthcare coverage. These facts alone support a conclusion that the Union and its members will suffer irreparable harm without an adequate remedy at law if the Court grants Defendant's motion.

   *4.*      *Public interest clearly favors denying the motion for stay.*

Without reference to a single case or statute, Defendant baldly claims that granting its motion to stay would somehow serve the public interest. [ECF No. 23 at pp. 17-18]. This is not so. What Defendant terms the "public interest" is really its own petulant self-interest to do whatever it wants and abrogate its contractual responsibilities. Shirking its obligation to reinstate improperly laid off workers and provide them with healthcare coverage cannot reasonably be argued as advancing public interest. Conversely, denying the motion would follow the well-established federal policy favoring arbitration as a means to encourage peaceful expedient resolution of workplace disputes and promote industrial harmony. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 547, 577-578 (1960).

**C.**      **Granting a stay of the preliminary injunction pending appeal would be logically inconsistent with the conclusion that Union members would suffer irreparable harm absent injunction.**

Granting Defendant's Motion would be counterintuitive and logically inconsistent with the Court's prior determination that Union members would suffer imminent irreparable harm without an injunction. See *Rodriguez by Rodriguez v. DeBuono*, 175 F. 3d 227, 235-236 (2d. Cir. 1998); *CNB Fin. Corp. v. CNB Cmty. Bank*, 2004 U.S. Dist. Lexis 21800 (E.D. Pa. 2004) (denying motion to stay because prior finding of irreparable harm and likelihood of success on the merits prevented opposite ruling). The Union's request for a preliminary injunction was an emergency measure to maintain the status quo and prevent serious irreparable harm to Union members. Namely, without the preliminary injunction preserving the status quo, dozens of Union members would lose their

13

healthcare, their very livelihood, or both. To stay the order pending appeal would render the decision, and the significant relief it provided, effectively meaningless. Put differently, in this case, if the preliminary injunction were stayed, it would have no value. It would allow Defendant to act with impunity to impose its will and ignore its contractual obligations by simply filing an appeal.

Additional Third Circuit case law supports the Union's position. In one case, the court emphasized that circumstances warranting a stay of an injunction directing the parties to arbitrate, though theoretically possible, would be "extraordinarily rare" and denied an insurer's request for stay of arbitration pending appeal because it would burden the policy favoring arbitration and the insurer failed to show extraordinary circumstances. *Sentry Ins. v. Pearl*, 662 F. Supp. 1171, 1173-1174 (E.D. Pa.), aff'd 833 F.2d 307 (3d. Cir. 1987). Defendant's desire to do whatever it deems fit without honoring any of its contractual obligations does not rise to the level of an "extraordinarily rare" circumstance warranting a stay of the preliminary injunction. With respect to the request for a stay of a preliminary injunction in another case, the Western District Court observed,

> "Although Rule 62 (c) recognizes that such apparently anomalous relief may sometimes be appropriate, the party seeking such relief is, not surprisingly, **deemed to bear a very heavy burden of persuasion** . . . since stay of decisions granting equitable relief pending appeal interrupts ordinary process of judicial review and postpones relief for prevailing party**, stay of equitable order is extraordinary device that should be sparingly granted. . . . burden of meeting the Rule 62 (c) standard for stays and injunctions pending appeal is a heavy one.**" *FTC v. Equitable Res., Inc.*, 2007 U.S. Dist. Lexis 36890 (W.D. Pa. 2007) (citations omitted) (emphasis added).

Defendant has utterly failed to meet its heavy burden of persuasion and the circumstances of the instant case do not merit resorting to the extraordinary device of delaying injunctive relief. As a result, Defendant's motion to stay should be denied.

Respectfully submitted,

14

JUBELIRER, PASS & INTRIERI, P.C.

BY:   */s/ Joseph J. Pass*
        Joseph J. Pass, Esquire
        Pa. I.D. #00044
        jjp@jpilaw.com


        */s/ Patrick K. Lemon*
        Patrick K. Lemon, Esquire
        Pa. I.D. # 316438
        pkl@jpilaw.com

        219 Fort Pitt Boulevard
        Pittsburgh, PA 15222
        Phone:  412-281-3850
        Fax:  412-281-1985
        Pa. Firm #: 141

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

NEWSPAPER, NEWSPRINT, MAGAZINE )
AND FILM DELIVERY DRIVERS, HELPERS, )
AND HANDLERS, INTERNATIONAL )
BROTHERHOOD OF TEAMSTERS, )
LOCAL UNION NO. 211, )
                               )
                Plaintiff, )
                               )        Civil Action No. 2:19-cv-01472-NR
                               )
                vs. )
                               )
                               )
PG PUBLISHING CO., INC. d/b/a/ )
PITTSBURGH POST GAZETTE, )
                               )
                Defendant. )
                               )

## AFFIDAVIT OF JOSEPH J. PASS

     I, Joseph J. Pass, hereby swear and affirm that the following is true and correct to the best of my knowledge and belief:

     1.     I reviewed the declaration by Richard Lowe dated November 29, 2019. [ECF Docket No. 22-2].

     2.     I have been an attorney practicing for 52 years and have represented the Plaintiff as well as other bargaining units at the Post-Gazette for more than 45 years in contract negotiations, and general contract administration. Those units include Teamsters, Writers, Pressmen, Mailers, Advertisers and Finance employees.

     3.     Although the declaration of Mr. Lowe alleges the company engaged in what he claims constituted "effects bargaining" and that the parties reached "impasse" in that bargaining [ECF Docket No. 22-2], nothing could be farther from reality.

4.      As Exhibit 4, attached to Mr. Lowe's declaration states, on July 17, 2019, the company advised the union of its intention to reduce print days and the parties met no less than 6-7 times to discuss those intentions. [ECF Docket No. 22-2].

5.      At no time during those meetings did the company move off its original proposal to the union.

6.      In Mr. Molinero's Affidavit dated November 12, 2019, it states at Exhibit 1 the company's proposal of September 11, 2019 was no different than the final offer dated October 1, 2019.  See Exhibit 4 to Mr. Lowe's declaration. [ECF Docket No. 22-2].

7.      Attached hereto is the October 3, 2019, letter the undersigned forwarded to the company disputing the defendant's self-serving declaration that an "impasse" had occurred. (Exhibit 1).

8.      In an email dated October 9, 2019, in response to the company's director of operations "summary of the meeting of October 7" the union pointed out that the employer had refused to engage in any discussions or proposals to alter Article III Section 3 and Article IV Section 2 of the CBA.  It is those Articles, which are the subject of the complaint demanding the company maintain the status quo pending a final resolution of those grievances through either mutual agreement or final and binding arbitration. (Exhibit 2).

9.      At no time during any of the meetings did the company ever suggest, propose, or address changing the grievance procedures and/or the status quo requirements set forth therein.

10.     Although the declaration of Mr. Lowe disingenuously alleges there "is no work for the former employees to perform" [ECF Docket No. 22-2 at ¶ 40], in reality those laid off employees worked all of October, despite print days having been reduced at the end of September. Obviously if there was work in October, after the cut in print days, there is work after October.

Date: December ___10___, 2019

_____
Joseph J. Pass

Sworn to and subscribed before

me this __10th__ day of December, 2019.

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
Darlene M. Drapela, Notary Public
Allegheny County
My commission expires August 17, 2023
Commission number 1264150
Member, Pennsylvania Association of Notaries